Good morning, Your Honors. May it please the Court, my name is Ina Lipkin. I represent Mr. Apelyan, the petitioner in this matter. It seems that the central issue before us today is whether the alleged mistake regarding the date of an assassination attempt on a minister in Armenia by an army general constituted the kind of mistake that would render the IJ's incredibility finding to be sustained. In this matter, the Board of Appeals completely ignored the petitioner's arguments regarding his explanation for the inconsistency. I mean, I think you focused on what my concern is here, so I think that's always good news that we're in the same place. The question that I have in terms of I kind of want to find out where we agree and where we disagree on this, because that to me is the most central of the inconsistencies. He was given an opportunity to explain, so you're not disputing that he didn't get an opportunity to explain. You're just saying that the IJ did not accept his explanation, right? One small caveat. Okay. I noted for today's argument the many places in which he always characterized the actions in 1998 as a plan, not as an attempt. And there are two points in the record in which he asserts that perhaps, and I think he refers to the asylum interview, that there must have been a mistranslation or miscommunication. And at that juncture, the judge should have asked the government attorney for the asylum officer's notes to give the petitioner an opportunity to see what the asylum officer wrote, how the question to him was phrased. Because if he, during his asylum interview, kept phrasing this incident as an attempt, then yes, that would point towards inconsistency. Okay. Does the nature of it, just hypothetically, assume that he was given an explanation, you know, he was confronted about this and that the IJ didn't believe it. Does it go to the heart of his claim? It goes to the heart of the claim if, A, he was trying to enhance his claim, in which this case would be the opposite. So that doesn't work as a factor against him. Well, I guess that's not exactly what I'm asking. Let's just say, you know, sometimes when we're talking about to the heart of the claim, let's say that it just had been a murder and it was a criminal act and it just – but he's claiming asylum based on political persecution. If this, in fact, was correct, and I'm only saying that hypothetically, does this go to the heart of the claim? I mean, was it a political act, it's an assassination, all of that? It could be argued that it does not, because this isn't the only incident of persecution he claimed. He claimed persecution over a four-year period of time, with a majority of his problems occurring after he was discharged from the Army in the year 2000, because he claims between 2000 and 2002 he suffered at least two arrests, numerous threatening phone calls, and members of his family were threatened. So in this case, one could argue that the majority of the persecution he suffered from the Armenian government occurred outside of his activities with the military, and therefore, if it is an inconsistency, it does not go to the heart of the claim. It doesn't form the bulk of his testimony. Well, an assassination attempt, would that ever be anything other than a political? Well, there's a different issue going on here. He was being framed for participation in this attempt in order for other members of the military to get an upper hand and remove this individual Samuel Babayan. Well, let me make sure I understand this. The assassination attempt is a matter of historical record, is it not? Yes. And that was in 2000. 2000. Yes. So there's no question about that. Right. Is there any question that he was actually in prison in 1998, as he testified? There's nothing in the record to dispute it. Dispute it. It's just his testimony. That's all there is. Right. He has a military booklet. I don't think that was identified in the booklet. And his explanation was, oh, well, I was under arrest for trying to plan, and that wasn't actually participation. Right. He never ---- It was, oh, I meant to say that I just planned it. Well ---- Was there any contemporaneous evidence of this ongoing plan to assassinate that apparently ran now, you tell us, for two years? That was my next question. Oh, sorry. Right. Well, it seems his testimony ---- In the record, that is to say. No, no. But it's his testimony that the seeds of the plan had occurred starting in 1998, which would make sense. A plan wouldn't just come into effect right away. Is there any historical corruption? Not in this record. Not in the record. Right. And I wanted to point out ---- No, I mean any learned journals or international law journals that we might, that you might refer to to say, look, this is some indication of what was going on. That was not discovered, no. All right. Let's assume, then, that your explanation is a reasonable one, that the explanation that he gave is a reasonable one. But let's also assume that the I.J.'s concern over this was reasonable because of the discrepancy in the dates and when the documented. Why, under the standard of review, would we be compelled, you know, why aren't you just asking us to reweigh it and say that the I.J. got it wrong? Because our standard of review, admittedly, is considerably higher than that. So why isn't it that situation? Why are we compelled? Okay. Well, this Court must review adverse credibility findings under the substantial evidence standard. That means that you need to see whether the I.J. considered and addressed the applicant's explanations for identified discrepancies. And in this situation where at least ten times on direct examination and at least three times on cross, this Petitioner at all times referred to this incident in 98 as a plan or alternatively as a plot, never once characterized it as an attempt. The I.J. failed to give that weight. Had this Petitioner gone into direct and started talking about this incident as an attempt, and then on cross the government rebuts his assertions, shows the background documentation, sure, that paints the Petitioner in a very negative light. However, starting with page 71 of the administrative record, lines 14 through 16 and 19 through 20, he begins on direct to characterize the incident in one light only, and that is, quote, unquote, a plan. On page 72, he refers to it as a plot. On page 73, 74, 5, and 6, he refers to it as a plan or alternatively as activities. On page 99, when cross begins, again, he refers to it as a plan and then explains that perhaps if there was mistranslation or miscommunication, it was at the time that the case was written by a non-attorney, a friend of his father's. I want to ask the Court, are you interested in hearing the Petitioner's arguments regarding some of the other points that the I.J. brought up for his negative negativity, negative credibility finding, or are we just going to talk about this? I understand that the BIA only relied on this one. Okay. I will, if there's no other questions, I will reserve my time for them. Did he fill out his own application? No. He testified it was a friend of his father's. Okay. A non-attorney. Okay. Thank you. May it please the Court, I am Blair O'Connor, representing the Attorney General on this matter. Your Honors, in many asylum cases, there is often a precipitating event that serves as a catalyst for all of the alleged acts of persecution that the applicant allegedly suffers from, and this case is no exception.  The Petitioner's case was his alleged October 1998 arrest, detention, and beating for his resistance to sign papers acknowledging that he participated in an assassination attempt on Carabao President Gukasian's life, which he said occurred. What do you say to the assertion that he didn't say that he participated in an attempt, he participated in a plan or a plot or whatever? My response, Your Honor, would be twofold. First of all, his asylum statement, which he signed under penalties of perjury, acknowledging that the information in it was true and correct, is unequivocal when he says, and I quote, he was imprisoned two days before an attempt on Carabao President Gukasian's life was committed. That's unequivocal, yes, in the asylum statement. And again, which he signed under penalties of perjury, acknowledging that it was true. In his testimony, I'd further acknowledge, and before the immigration judge, both on direct and cross, he said that at the time that he was detained in October of 1998, General Bababian was already detained for that assassination attempt. It would make no sense whatsoever that the Armenian government would be in a conspiracy to start to collect evidence and have already detained the mastermind of the assassination attempt 17 months before the attempt even occurred. I mean, he's unequivocal in his testimony that General Bababian was already had been arrested and was being held for that attempt. So that is completely inconsistent with what we now know as historical fact, that the assassination attempt didn't occur until March 22, 2000. Was he given an adequate opportunity to explain the discrepancy? The government definitely believes he was, Your Honor. I mean, on cross-examination, that's when the government attorney first presented the two pieces of evidence that showed that the assassination attempt occurred on March 22, 2000. And they repeatedly asked him, can you explain this? I mean, you're saying that you were detained in October 1998 for being asked to do that, you know, but it didn't occur for 17 months later. And his explanation was, well, I was, again, first of all, he said it was a translation error, again, but we would say that that doesn't absolve him of his – of the fact that he signed his asylum application under penalties of perjury swearing that the information in it was true and correct. Was it prepared by an attorney? All we have is his claim that the asylum application was prepared by a good acquaintance of his father. That's what he testified to, Your Honor. Okay. Because there is a – there is an entry of appearance by an attorney. Yes. That was at the time that proceedings – That was the actual hearing? Yes, Your Honor. Yes. Okay. Now, the standard in terms of if, you know, you obviously have to give someone an opportunity to explain. You can't just sandbag them and then later in some written decision say, and this is why I'm not believing you. But by all means. What's the standard, assuming that his – that he was given an explanation, an opportunity to explain? What is our standard of review? Does the evidence compel the conclusion that his explanation was reasonable and persuasive? And the evidence in this record clearly does not compel that conclusion. Again, we would note that even assuming – I mean, again, his explanation that, well, I was arrested because I was asked to participate in the planning of the event. That is completely inconsistent with his own acknowledgement in his testimony that the mastermind of the assassination attempt was being held before they even put him in detention. And that his testimony was, well, the Armenian government was trying to build this case against General Babayan when he was already being detained for the two days earlier. That is not a persuasive explanation. All right. Well, counsel for the appellant is basically, well, I mean, I think she feels her – that his explanation was better than the other side. But let's just for argument's sake assume that appellant gave an explanation that put it in equipoise. Where does that put them relative to the standard of review from your perspective? Clearly that they would not satisfy the standard then. Because, again, the standard is the evidence must compel the conclusion that this was a reasonable explanation that he was credible. And when it is disguised in the Supreme Court under the substantial evidence standard, when you can accept either or both sides and both are reasonable, that does not satisfy the compelling evidence standard. How do you respond to counsel for the appellant's argument that the I.J. should have looked at the asylum application and on the translation or something on the asylum application? Well, I give her credit. I think it's a clever argument at the 11th hour right now. But I would say that it was his burden of proof and that if he had problems at the time when he said, well, it may have been a translation error during the asylum interview, he should have asked, his counsel should have asked at that time before the I.J., wait, I want a continuance. I want to get the asylum officer's notes to see if there's anything to back up this claim, that there was problems with the translation. Can we call the asylum officer? It's his burden. He's the applicant for relief under 1208, 8 CFR 1208. He bears the burden. And so he has the burden to call that asylum officer and to try to support that 11th hour allegation that there may have been a translation error on the asylum statement and during the interview as well. And again, we argue that his — And he did have counsel at that time? During his hearing, yes, Your Honor, by all means, yes. We would argue, too, that definitely this is an inconsistency, a major discrepancy that goes to the heart of his claim. Again, it was his alleged detention and beating in 1998 that served as a catalyst for everything that followed. He said it was because of that event that he tried to desert the military a couple weeks later. He was unsuccessful. He was allegedly shot and was hospitalized. His father allegedly tried to visit him while he was in the hospital and was beaten up and roughed up and suffered a fatal heart attack. He then, when he tried to attend his father's funeral, he alleged that a senior military officer tried to bribe him. When he refused the bribe, he got into blows with the senior officer, yet was never court-martialed. And it was because of all these abuses that he suffered in the military that when he finally left the military, he joined this opposition political group, which was a catalyst for the incidents of alleged persecution he suffered thereafter. And, again, it's very important to note that all the incidents that he allegedly suffered in the military we now know occurred prior to the assassination attempt on President Gagassian. I'm sorry if I'm mispronouncing that. So, again, this definitely goes to the heart of his claim. It was a triggering event for everything that followed, and it's simply beyond dispute to say that we have a major discrepancy as to the triggering event for the asylum claim, that that definitely goes to the heart of the asylum claim. Lastly, again, I will note, although the Board chose not to specifically comment on them, they did affirm the IJA's decision, and he did rely on some other inconsistencies, number one being the date when the Petitioner got his membership card for the National Democratic Party. He initially testified that he got that card that was in the record a year after he joined in 2002, initially said. Then he said, no, I got it on April 1st, 2001. When it was pointed out to him on cross, then how come the issuance date on the card says August of 2004? For the first time, he says, oh, no, no, wait, that was the second card I got. The first card was confiscated when there was a siege on the party headquarters. He never testified to that earlier. You call that the one explanation too many? Yes, Your Honor, again. Too many dates of when he got the card, okay? Well, now, if it had been that alone, that might have been a good explanation. If it had been what alone? If that had been the only discrepancy in dates that he had. Oh, then we would probably have a much different case, Your Honor. Again, I point it out as another reason that would support the determination. Clearly the most significant discrepancy and the one that really is fatal to his claim is the discrepancy on the date of the assassination attempt. And then lastly, I would also note that his claim that he was never court-martialed or prosecuted in any way for striking a superior officer in the military is pretty far-fetched and implausible. And the judge noted that the reason he said that is because he was stuck, because he'd ended his direct testimony by stating that at no time throughout his time in the Armenian military was he ever presented with an arrest warrant, was he ever formally charged, was he ever formally prosecuted for anything. So he was stuck at that point, and he had no choice but to say, well, I wasn't prosecuted for striking a colonel in the Armenian military. Instead, they dealt with me in different ways. But that wasn't a plausible explanation. In the final seconds, I'd just note that beginning, because the board and the immigration judge solely denied asylum on grounds of adverse credibility, the other arguments in Petitioner's brief regarding the merits of his asylum claim are not before the court. And if the court were to reverse the adverse credibility, it would obviously have to remand. In conclusion, again, we would say that in this case, you are presented with the time has expired. I'm sorry. Thank you. Thank you, Your Honors. Your Honors, if I may briefly address some of the points Mr. O'Connor brought up. First of all, the plausibility of the actions of the military against the Petitioner are not within the purview of the IJ to make. He relied only on speculation and conjecture to find that that would be implausible, which is interesting, because on page 104 of the record, he says that he accepts the Petitioner's explanation. Therefore, he did not give him an opportunity to explain if that's what we're going to hang our hand on, that it was implausible. Turning to the ID card, the membership card in Exhibit 7, the judge, if he found that document to be problematic or fraudulent in any way, then he could have sent that out for forensic review, and he did not. Therefore, he had to accept the Petitioner's explanation that that card was sent to him. There was no question. What's your best case for that proposition? Kumar v. Gonzalez, a 2006 case. Which holds? It was a case in which there were some fraudulent documents, I think, about a birth certificate. And the IJ speculated that it was – it couldn't have been made the way it was made, but he didn't send it for – didn't order it sent for forensics. And this Court found that that was an improper basis to find the Petitioner incredible based on a document that hadn't been examined. You seem to be putting some burdens on the IJ here that I think were burdens on your client. Well, I mean, you know, the IJs don't, you know, they – I mean, he could note that there's an inconsistency in the dates and say – which is true. He didn't – it doesn't mean that it would have to be a fraudulent document or anything along those lines. I mean, there are certain things your client was represented, that why wasn't your client bringing certain things up if you're making certain claims to support those? Well, in the case of the documented issue, he testified – I asked for the document and it was sent to me. Neither the IJ nor the trial attorney asked, well, who sent it to you? How did they get it? And absent that kind of foundation, it was improper to rely on this basis to find him incredible. Okay. Your time has expired. Thank you so much, Your Honors. Thank you. The case just argued is ordered submitted.
judges: Schroeder, Lucero, Callahan